The next case is United States v. Singh. Good morning, Your Honors. May it please the Court, my name is Gary Shore and I represent Mr. Singh in this appeal before Your Honors. The issue in this case, the issue before this Court, is whether the prosecution presented sufficient evidence supporting the mens rea element of the attempted obstruction charge, whether Mr. Singh acted corruptly with an improper purpose and whether he sought to have the complainant recant not the facts but the conclusion that she was kidnapped, that she was held against her will. Respectfully, the prosecution's proof on that element was deficient. Okay, so at one point, well, let me start off. Ms. Anwar had her shoes with her at the house before Mr. Singh put her in the car, is that right? I believe Ms. Anwar was wearing her shoes when she left the other vehicle and walked towards Mr. Singh. Right, and so her sandals were left on the ground but he did try to get her to testify that she asked him to take her to the car because she didn't have her shoes with him because she left them at a party, is that right? That's what her testimony was. Okay, so why would that not be enough of a lie to to have the form the basis of an intent to corrupt? The focus should be not on what happened there on the street because there was no, he admitted that he slapped her and that he picked her up and took her to the car, but the focus of the court and the focus of the mens rea with respect to the obstruction should be on whether or not thereafter she was held against her will. And there's... But how connected is the kidnapping charge and the conviction on the obstruction charge? They don't have to be in lock and sink, right? They both exist. The government didn't charge him with assaulting her. They could, maybe they could have. They didn't charge him with anything other than the kidnap. Yeah, but that's not the, my question is there's a difference between maintaining that you are ultimately innocent of kidnapping and between asking someone to lie about a potentially incriminating fact, right? I mean, that's different. Well, I don't necessarily think it's different. It's the elements of the crime that he was asking her to not lie about, but to tell the truth about. Tell the truth about the fact I didn't hold you there. I didn't hold you against your will. I'm wondering, it seems that your argument hinges on the fact that the jury didn't convict your client of the kidnapping, but I thought it was black letter law that sufficiency analysis was separate from the question of, I'm not saying the verdict was inconsistent, but an inconsistent verdict. I mean, it's not the failure to convict on kidnapping does not tell us whether there's sufficient evidence or not. It's not even relevant to the question of whether there's sufficient evidence as to the attempted obstruction. It tells you that we're not arguing. No, I'm not. We're not arguing inconsistent verdicts. We've never claimed that in any way. But the argument is that when someone says, tell the truth, that's not obstruction. But isn't it obstruction to say, go today and take back your statement? Take back your statement. And tell the truth. That's really what he was saying to her. Well, then that's why I'm asking about the shoes. If he said, don't tell them why you went back was because you left the shoes at the party, when that is not why she went back, why isn't that enough of a lie to not be what you said, which was tell the truth? Because again, I believe that what he was saying is tell the truth that I didn't hold you against your will. But the specific fact of where the shoes were, he asked to at least lie about that fact, right? Yes, but I don't believe that fact in and of itself, lying about that fact would have been obstruction or asking her to lie about that fact would have been obstruction. The obstruction had to go to the charge. The conversation was he directed her to attest that she told him to put him in the car because you came from the party and you did not have your shoes. That is why you told me to put you in the car. And so I did, just like couples, you know. So he was asking her to say something that was false and that would tend to support his position at the trial. He was asking her to say something that wasn't supported by the videotape. But again, I believe that the focus needs to be on the issue of whether or not thereafter she was held against her consent. But that goes to whether there was sufficient evidence for kidnapping. And the trial court addressed that when that same argument was raised. The trial court said it's quite possible that the jury found that at some point in time, after they stopped where he went to get her a drink, that she, at that point, was not held against her will and was not held against her will when she was taken across state border to New Jersey. But that's separate from, that may have explained the jury hanging, if you will, not returning a verdict on the kidnapping charge. But that doesn't impact the decision of what your client was trying to do at the time he was asking her to make these statements. He didn't know whether the jury was going to hang or not. It was to influence whether charges should be brought. Well, the charges had already been brought. In the first place. The charges had already been brought, and the only – Were maintained, I should say. Well – He says, they're going to fry me. You understand what kidnapping is. Tell them I didn't force you. I mean, these are all – you have to read it in context. And the jury did, didn't they? Well, that – In reaching their verdict? The only charge against him was the kidnap. And when he's asking her to tell the truth about what happened, and it focuses on the lack of consent with respect to the kidnapping, I don't believe that's obstruction. The obstruction has to be obstruction of some charge that the government has against – or brought against the defendant. Thank you. We'll hear from the government. Good morning, Your Honors, and may it please the Court. My name is Amanda Shammy, and I'm an assistant United States attorney in the Eastern District of New York, and I represented the government in the District Court below. The issue here is what the defendant did to obstruct the government's investigation into his kidnapping of Sadaf Anwar. The facts as they came out at trial was that both the defendant and the victim were problematic people in a toxic relationship. And what also came out at trial is that the defendant sometimes acted with anger and abuse towards Ms. Anwar. So he's – if you can explain to me what we were supposed to do about the fact that he was not convicted of kidnapping, and why is that – why that doesn't obviate any sort of obstruction charge if he was asking for facts to come out. Yes, Your Honor, and this is something that Judge Livingston hit on, which is that it is black-letter law under the Supreme Court's precedent in United States v. Powell 469 U.S. 57, a 1984 case, that sufficiency of the evidence should be not confused with the problems caused by an inconsistent verdict. And in fact, there, the court said very specifically it wasn't even the case of a hung jury on one count and conviction on one. It was acquittal on one and conviction on the other, finding that there is no reason to vacate the respondent's conviction merely because the verdicts cannot rationally be reconciled. And here, Your Honors, I submit that the verdicts can be rationally reconciled, both for the reasons that Judge Chen artfully indicated in the record on the Rule 29 motion and for several of the issues that Your Honors have highlighted here today. In that case, the Powell court continued by saying that the respondent is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted. And that's what happened here. The arguments that my colleague has made today were arguments that he made to the jury. He submitted to the jury during summation, throughout the trial, in disparaging the credibility of Ms. Anwar, who did have, admittedly, credibility issues, that all that he was doing was trying to tell her to tell the truth. But that is not what he did. As Judge Perez noted, he gave her specific instructions. So he would argue that the shoes were too small. It was too much of a minutia. It was too much of a minor detail to actually give rise to an obstruction charge. What would be your response to that? Your Honor, I think that that was only part of the conversation that was reported at Government Exhibit 420, which is reproduced in the appendix, in the government appendix, at 88 to 90. And there, although the defendant knew that he... Can I just tick them off? Sure. So let's just assume for a second, which I'm not saying we'll lock down, but assume for a second that the shoes are too small. The shoes are too small of an issue. What are the other things that you think give rise with a corrupt intent? Yes, Your Honor. So that is in 420. So not only does he mention the shoes, but he also tells her, you need to tell the government that you asked me to put you in the car. And not only did I put you in the car, but I put you in the car carefully, and I helped you sit in the car. The video shows a very different turn of events. What it shows is her being carried on his shoulder and being forced into the car. And he knows that that video exists because the government produced it in Rule 16. He tells her... Okay, so there's the car entry. What else? So there is that and the fact that she asked him to. There is no evidence that she asked him to. In fact, her mother testified, because she was on the phone with Ms. Anwar when the defendant attacked her, that all that she heard was her daughter crying and asking for help. There was no conversation that there was a consent to be placed in that car. There was no conversation that there was a request at all by Ms. Anwar to be taken away from her family. The fact that she was calling her mother to be let into her house is proof positive that she had no intention to go anywhere with the defendant at 430 or 330 in the morning. Right, but that's kind of muddying the issue of the corrupt intent. That is a fact that you use to try and prove the kidnapping charge. If he sees that differently, so what are the examples that you think, other than the shoes, that best signal a corrupt intent? So the fact that he asks her to lie about how she got into the car and that she requested. That is belied by the evidence of the pictures of the injuries, the testimony by four law enforcement officers who observed the injuries. And if we want to even move past the point of the kidnapping, we can actually... But we're not trying to prove the kidnapping. We're trying to see what his intent was. So the shoes, telling her how she got in the car, what else? So he did not want her to tell the government about her injuries or to tell law enforcement about her injuries. This is, Your Honors, in Government Exhibit 401T, which was produced at Government Exhibit... Sorry, Government Appendix 76. There, the defendant and his colleague, Pavatar Singh, were discussing what was happening in Hindi. Okay, the injuries, okay. The injuries, where he says that moron is showing her wounds, whore. And Pavatar responded, should I say something to her? And then Singh directed his friend, you tell her not to say anything, they will let us go. Throughout, his purpose is to be let go. There was no indication, tell her to tell the truth, because the fact is, the truth was that she was assaulted, that she was hit multiple times, that she sustained injuries, and that she was taken against her will. And was the jury's role in this case to assess the evidence in light of the government's argument that you're presenting here and the defense's argument that I wasn't telling her to lie, I was just telling her to tell the truth, that I carefully put her in the car, that she asked me to put her in the car because she lost... She didn't have her shoes. These are all things the jury can assess and draw inferences on whether, in fact, that was the intent was to get her to lie or to tell the truth. That's up to the jury to decide that, correct? That is absolutely correct, Your Honor. And that is exactly what the jury did here. The jury... As you're marshalling the evidences that would support the conviction here, could you address the treatment at trial of the facts or the evidence that Camille offered Anwar $5,000 to drop the charges? I mean, there was a dispute, I guess, at trial about the import of that evidence. Yes, Your Honor. The government does believe that that is evidence of also obstructive intent. What Mr. Shore, my colleague, did during trial was try to muddy that by indicating that at some point the defendant told Ms. Anwar, don't talk to Camille anymore. Was that on a recorded line? Not that I was aware of and below. I mean, the issue, I will also say, is that because the defendant and his compatriots were discussing everything in Hindi, there was a limitation to what the government was getting translated. But there's also nothing other than inference to suggest that Singh had Camille make that offer. Is that right? No, except, Your Honor, that there are multiple exhibits that the government entered into evidence that the jury heard that were discussions between Camille and the defendant about what they were trying to do to get the defendant, excuse me, the victim to recant. And those are at Exhibits 413, 414, and 415, which are at Government Appendix 79 through 84. No, no, no, of course. The theory is that the government argues a reasonable inference or argued a reasonable inference at trial that the two men talked about getting her to change her testimony and that the fact that Camille offered her a bribe was then something that presumably his friend authorized. It was something that they both conspired to do by virtue of their conversations about trying to get him out of prison. They schemed to obstruct justice. They discussed the plan of pretending to tell her that Singh loved her, to sweet-talk her, to get her to recant. And Camille said, if she won't get you out, we will do something. And they were all in on the conspiracy to try to get the defendant out of prison. I see my time is up. So thank you, Your Honors. Just quickly, in response to some of the things that were mentioned during the government's argument, one of the items of evidence that the government is relying on is a statement at the scene of the arrest in which Mr. Singh speaks to the gentleman who was also in the car and says, try to get her or get her not to make any statements. It's important in understanding this obstruction charge, this attempted obstruction charge, that while that was known to the government when they brought their initial indictment, it wasn't until a second superseding indictment that there was any charge of attempted obstruction. But that's not uncommon. It may have been that, you know, in a lot of domestic abuse cases, that may be a common occurrence, and police aren't going to charge obstruction based on just that initial. But that doesn't keep the jury from looking at that evidence to draw whatever inference they deem appropriate from it. You're not suggesting that conversation, if the jury heard it, is irrelevant to his motivation? I mean, that can happen. Otherwise, there may be a lot more obstruction charges. But it may have been that, as evidence developed of these phone calls, reported conversations while your client was incarcerated, that the authorities determined now there was enough evidence for obstruction, or cause to charge obstruction. I'm not arguing that that was not relevant and was not admissible at trial, that statement at the scene. But I am arguing that it wasn't until this other series of jailhouse calls that the government even fought to indict him with respect to any sort of obstruction. And then the other point that I just wanted to raise is that with respect to the $5,000 from Mr. Kamal, I believe that it's either in the recordings or she admitted during the course of her examination that she was told that not to listen to Mr. Kamal and that there is no evidence that she was told by my client not to listen to Mr. Kamal or anything that he had to say. And there is no evidence at all, as far as I believe, that he ever told Mr. Kamal over the phone and the government had recorded all of those calls that he or Mr. Kamal ever discussed bribing Ms. Anwar. Thank you. Thank you both. And we will take the matter under advisement. The next case is Corey V. Waters. Thank you so much. Good morning, Your Honors. I'm Stephen Warshawski for Defendant Appellant Dr. Pierre Corey. May it please the Court, this is an appeal from the District Court's denial of Dr. Corey's motion to dismiss, which was asserted on grounds that Dr. Corey is immune from suit and liability under the federal PREP Act, and that he is not eligible to be a defendant. The court has decided that for plaintiff's claims arising from Dr. Corey's treatment of the decedent, Mr. Waters, for COVID-19 in December of 2021. The HHS Secretary invoked the PREP Act effective February of 2020 in response to the COVID-19 pandemic. This case falls squarely within the immunity provisions of the act because in this particular case, the plaintiff himself alleges that Mr. Waters was injured and ultimately died as a direct result of the high-dose prednisone that was prescribed by Dr. Corey to treat Mr. Waters for COVID-19. So all the elements of immunity under the statute apply in this particular case. Now, the failure to prescribe the gastrointestinal prophylaxis, that's not a covered countermeasure, right? Well, the failure to prescribe something is not a covered countermeasure. But in this particular case, what we have is a very broad immunity provision that covers all harms. Harm is the key. Caused by a countermeasure, including any harms that are related... Is it harm or is it loss? I'm sorry? Is it harm or loss? It's loss. Right. All claims for loss. And here the claim for loss is the injury and the death. The prophylaxis is directly related to the covered countermeasure because the plaintiff alleges that it was part of what would be required to safely manage the prednisone therapy. But he had comorbidity issues, right? He also had gout for which he was prescribed steroids, the same treatment, right? Not just for COVID. I think his medical records show that he had been prescribed steroids for various conditions. In the past. So this was not a new... The steroid treatment treated both the gout and the COVID, correct? I mean, no doubt the doctor indicated he prescribed for COVID, but he had been on steroids for gout. And the countermeasure, the HR blocker, is something that's routinely given to patients who are on steroids to prevent precisely the type of side effect that in this case is alleged to have caused his death. Well, that's the plaintiff's allegation of negligence. That's correct. We of course dispute that, but this particular case at this stage is about the immunity provision. No, I understand it's about the immunity provision, but I'm trying to understand how this is different. And I know the Solomon 1 and 2 case, I know Solomon 2 was decided on the remand, whether it was appropriate to have this case be in federal court. But the district court addressed the issue of the treatment in that case was someone is put on a ventilator to treat COVID-19, but then they're not moved. They're not rotated and they die as a result of an injury for failure to take that sort of preventative measure. It seems like this is that type of case here. It isn't the treatment for COVID precisely that caused the death, but a side effect to one of the medications he was on, the steroids. I think that's incorrect, Your Honor. This case isn't that case because the plaintiff's theory of harm is precisely that the ulcer was caused by the covered countermeasures, by the prednisone therapy. So unlike, say, the ventilator cases or unlike the case of Mills, we don't have an allegation where the plaintiff is not, we don't have a case in which the plaintiff is not claiming principal harm by a covered countermeasure. Here, in fact, the plaintiff's allegation is the harm was caused by the prednisone, which is a covered countermeasure. That's like a vaccine case. I'm sorry? It's the prednisone without the prophylaxis though, right? Well, that's a theory of negligence, but the prednisone itself is the covered countermeasure that is causing the harm. How is that different from the ventilator? The ventilator is what caused the harm because the prophylactic measure of moving, turning the patient didn't occur. How is that different? Well, because in the Solomon case, they're not claiming that the active ventilation, the use of the ventilator itself caused any harm to the patient. And here, they're not claiming the use of the prednisone here caused the side effect of the ulcer. Yes, they are. Same thing as the ventilator though. The ventilator, the use of the ventilator without turning the patient caused the patient to be stationary, right? I disagree, Your Honor. In fact, the plaintiff is directly alleging that the ulcer was caused, in fact, by the prednisone. The theory of liability, the theory of negligence, is that in administering the prednisone, and this brings us again within the scope of the because they claim that the prednisone should have been administered in conjunction with the prophylaxis. But it's admitted... Just like it was when he was in the hospital and treated in the same course of treatment, then that would... I'm struggling. Help me understand how it is commonly known that when somebody is on a high dose of steroids, these countermeasures should be used, correct? The prophylactic measures of the HR blockers or other medication to prevent an ulcer. Some people within the medical community hold that view, but that's not the view that Dr. Corey holds, and that's not the view of recent research. That may not be his view, but the point is that it's a common treatment or a common measure used when somebody is put... Just like if you put someone on a blood thinner on Coumadin, you're going to have to make sure that you measure the Coumadin levels, that it doesn't cause something else. So I guess I'm struggling with how someone like your client with comorbidity that is receiving steroids for two conditions, COVID-19 and gout, then isn't given the proper medication that he was given when he was in the hospital treated by other doctors, that that enables your client to have immunity under the immunity provision for COVID treatment. I'm struggling with that. Because PrEP Act immunity supersedes issues of negligence. You don't have to establish that you met the standard of care in order to get immunity. In fact, as the Oklahoma Supreme Court pointed out in response to this very argument in the Franklin case, which I submitted to the court over the weekend, they pointed out that conditioning immunity under the statute on meeting the standard of care turns the statute on its head and renders it a nullity. I understand that. So it's not a standard of care question. I understand that if it was the prednisone alone without the prophylactic measure. I guess what I'm struggling with is the case law also says that the immunity provision should be read more narrowly to cover the treatments that are directly related to COVID because it's a new, it's a pandemic, and the idea was to try to treat people. So I don't know how that reading it narrowly covers this other medicine he should have been on. Well, this case law, I think, says that the immunity provision under the PrEP Act is actually quite broad. And I think the issue, though, is once you zero in on are you talking about a covered countermeasure causing the harm? That's when immunity is triggered. The covered countermeasure in this case is the prednisone. The plaintiff himself alleges that that was the principal cause of the ulcer. Therefore, since you have harm caused by a covered countermeasure, immunity under the statute is triggered. And now you fall into a different way of handling those issues that Congress decided under the PrEP Act. So again, it's not a question of theories of negligence. It's a question of mechanisms of harm. And so long as the harm is caused by a covered countermeasure, then the immunity is triggered. And that's why this case is different than cases, for example, that there was an argument about a failure to use a countermeasure or something which didn't constitute a countermeasure. This is squarely within the scope of PrEP Act immunity. Can you just for me one more time talk about how you would distinguish the Mills case? So the Mills case would be distinguished on several grounds. As the court itself and Mills pointed out, the plaintiff herself did not allege that the harm she suffered was actually caused by the covered countermeasure in that case. Mills is an interesting case because the covered countermeasure was a COVID-19 test. And the connection to the plaintiff's treatment was the delay in giving the treatment. And what the plaintiff said is the test really was separate and apart from the treatment. You could have given the treatment. There was no reason for the delay. But this is really a completely separate issue, even under your own regulations. If you had diagnosed me properly, I would have been allowed to be treated regardless of the COVID test. And I think that that's what the Mills court really zeroed in on. And as they say in the decision, we are relying on the allegations of the plaintiff in the case. I think if the plaintiff had made a more explicit argument that because they waited for this COVID-19 test, that delay resulted in my harm, I think there'd be a little bit more difficulty in squaring that with the language of the PrEP Act immunity statute. Your opponents are arguing that it wasn't the steroids per se. It was the failure to give the HR blockers or the other medication to prevent the ulcer. So that it wasn't the countermeasure for COVID that caused this. It was the failure to do something else. So I guess the question is whether the failure to give the HR blocker or the medicine to prevent the ulcer, is that a countermeasure to COVID or is that something else? Well, respectfully, I disagree. I think the plaintiffs are saying the harm was caused by the prednisone. What they're saying is there was negligence in the administration of the prednisone, which they say should have been in conjunction with the prophylaxis. So again, it's the administration or use of a covered countermeasure. So they're saying the use of the countermeasure, the prednisone caused the ulcer. But also there was negligence, they allege, in the administration of the countermeasure because they didn't administer it in conjunction with the prophylaxis. So trying, as the district court did, to say the prophylaxis is a separate and distinct issue, they're clearly intertwined. And once you have a harm caused by the countermeasure itself, the immunity provision is triggered. We'll hear from the appellee. Good morning, your honors. May it please the court. Austin Bursick Johns for the plaintiff appellee, Edward Waters, junior administrator of the estate of Edward James Waters. To the extent it's necessary, I'd like to reserve 30 seconds on the cross-appeal rebuttal. Counsel, can you speak up or move the microphone a little closer to you? Is that better? Much better. I'll speak up. Okay. The problem with the defendant's argument is that it simply ignores the fact that none of the plaintiff's allegations are that the defendant was negligent in administering or using a covered countermeasure. There's no getting around that. A covered countermeasure within the meaning of the PREP Act is any medicine used to treat, cure, prevent, or mitigate COVID-19. How about what your colleague just said, that essentially you're alleging negligence in the administration of the steroid arising from the failure to simultaneously give a prophylaxis? Right. The case law and the language of the PREP Act is very clear that when immunity applies, it's when a countermeasure is used, is administered. And you're not disputing that primazone is a covered countermeasure, is that right? That's right. Okay. So how is it not a prophylaxis? If you can see that primazone is covered, then how is it not the failure to administer? The case law talks about the fact that a failure, even a failure to prescribe a countermeasure does not entitle the provider to immunity. And here we're talking about the failure to prescribe something that's not a countermeasure. Even if the gastrointestinal prophylaxis were considered a countermeasure, there's still no liability because it was the failure to prescribe that. But how is that different from a negligence claim? Different than a, I'm sorry? Negligence claim. The plaintiff is alleging medical malpractice, but it's not within the umbrella of the PREP Act. So there are... But I thought the whole point of the PREP Act was to try and protect against debilitating lawsuits like that. The point of the PREP Act is to protect covered persons from administering or using covered countermeasures, and that's not the case here. Okay, but you're not disputing that he used prednisone? There was prednisone involved, but this does speak to the broader issue here, Your Honor, which is just because a countermeasure is involved, does that excuse a provider from any other negligence that's involved in the provision? So you are raising the negligence claim? It's the underlying claim is a medical malpractice claim, Your Honor. Well, the statute, I mean, your adversary correctly said that the PREP Act immunity has been characterized as fraud, and the statute doesn't require that a covered countermeasure be the sole or even the primary cause of the loss. You're arguing essentially, I guess, that the causal relationship, that there's some proximate cause relationship, but I'm having difficulty reconciling that with the language of the statute, and it seems to me that Mills is distinguishable and that the COVID test was in a way the cause of the loss was independent of the loss in that case, while here the cause is definitely part of the cause, the administration of the prednisone. So help me understand how I'm misunderstanding. So I think there are cases like Mills that deal with countermeasures where the talk about an independent and distinct cause of the harm, they're really talking about proximate cause, because the cause in fact, I don't see how you can get around saying that the COVID test was not a cause in fact, or the ventilators were not a cause in fact of the bed sores they were. But what the plaintiffs, they're alleged was there was a different proximate cause of the harm, and that's why they were allowed to proceed. And I think it's one, there can be more than one proximate cause, and I think you can't argue that prednisone wasn't one of the proximate causes. Isn't that correct? I mean, he wouldn't have died from the ulcers if he hadn't had the prednisone. It was a cause in fact, but it wasn't the proximate cause. The proximate cause was the many failures, and one of them was the failure to prescribe a gastrointestinal prophylaxis. And the PREP Act speaks to, the term it uses is causal relationship, which doesn't say cause in fact or proximate cause, but you know, when we're, when the court interprets those laws, I think it needs to read in the century of case law or more on torts and what causal relationship means, and it always means cause in fact and proximate cause. To uphold the district court's decision here with regard to counts one and two, would also comport with other circuit court decisions, such as Hampton v. California, which points to the fact that the non-administration or non-use of a measure does not entitle the provider to immunity. It would also comport with Hudak v. Elmcroft out of the Sixth Circuit, which encompasses the same principle there, that the non-use does not lead to immunity. There were also many other allegations of failures to act here, which I list in a couple of places in the brief. One of them is on page 49. And I think it does all come down to the fact... Well, I guess part of the thing I'm stuck on is that I understand the statute to say that the sole exception to immunity is where the defendant engaged in willful misconduct. So if, it's... How is ordinary malpractice or ordinary negligence not covered by the immunity? The exception for willful misconduct would permit a claim directly alleging that the covered countermeasure was the cause in fact and proximate cause of the harms. I don't understand what you just said. I'm so sorry. So my understanding of that language is that a plaintiff can allege, if the plaintiff here were alleging that the defendant shouldn't have prescribed prednisone, that would be subject to the PrEP Act immunity. But if the plaintiff alleged there was some willful misconduct in prescribing... If he had willfully allowed your client to pass away by willfully denying a prophylaxis, he wouldn't be able to get the claim of immunity. But my question is, why isn't ordinary malpractice or ordinary negligence not covered within PrEP immunity? Your Honor, I think you're adding a step there. Willfully failing to prescribe the gastrointestinal prophylaxis is what your last question was. And I'm saying the failure to prescribe the gastrointestinal prophylaxis takes it out of the umbrella of the PrEP Act. How can that be when it says that the sole exception to the immunity is where the defendant engaged in willful misconduct? I need help from you because I'm looking for the hook for where ordinary negligence or ordinary malpractice is outside of what the PrEP Act covers. I read the willful misconduct as being the sole exception saying, you know what, for better or worse, a determination was made that ordinary negligence and ordinary misconduct are available for immunity. What in the text do you see and what do we do about this willful misconduct language? What am I supposed to do with that in terms of interpreting what is covered by the statute and what isn't? The willful misconduct exception applies to the administering or use of a covered countermeasure, and that's not this case. This case is the failure to prescribe something that's not a covered countermeasure. So you're not relying on the exception to willful misconduct that's in the statute. I never understood you to be relying on that. Correct, Your Honor. What you're saying is what I understood your argument to be, and my question now relates to cases that the district court relied on. Wilhelms out of Ohio, Solomon, the district court, Solomon one, not the remand issue that was decided by this court. How did those cases relate to your case? Because there, as I understand it, it was ventilators were used to treat COVID and patients died as a result of side effects they developed from the use of the ventilators because of failures to, by the medical staff to address those side effects by turning the patient, by treating the pressure points, et cetera. But I'm trying to understand how those cases relate to this case. I think this case is exactly like a case like Solomon where the use of the ventilator, how can you say anything but the ventilator was a cause and effect of the bed sores and the ventilator was a covered countermeasure. But the court there found that it was the failure to really take standard steps in the practice of medicine by turning a patient on a regular basis. And is that because medical professionals generally understand that if you put a person on a ventilator, whether it's for COVID-19 or some other condition they have that this type of prophylactic measure of moving the patient should occur. I think that was part of the court's reasoning, Your Honor. And is part of your argument that a reasonable medical provider would understand that if somebody is given a high dose of steroids over a prolonged period of time, or for some time, they should be given an H2 blocker or some other measure to counter the potential side effect, which is what this gentleman was given when he was admitted to the hospital and not treated by Dr. Corgi, correct? Correct, Your Honor. Yes. Would you, how would you interpret a case that involved a claim that too much prednisone was prescribed as opposed to the failure to give a prophylaxis? I think if the claim is there was too much of a covered countermeasure, I think that's subject to immunity. But that's not the claim here. The claim here is you failed to prescribe something that's not a covered countermeasure. And I think, uh, maybe I'm harping too much on the point, but I think looking at the term causal relationship in the context of those two prongs, I think solves all those questions. The proximate cause is how, how these cases are all reconciled, whether it's the ventilator or the COVID-19 test delaying the heart attack treatment. Of course, that was a cause and fact of the delayed treatment. They were waiting on a covered countermeasure, but there was, uh, enough of a distinction, enough of a gap in the causal chain where the court permitted that case to proceed. And I think, uh, I know I'm far over time, um, if I could briefly conclude, Your Honors, um, on the PrEP Act, you know, clearly the court understands the question here is just how far the immunity applies. How far does that shadow fall from, uh, the PrEP Act immunity? And is it going to cover anything that is medical negligence just because a countermeasure was involved? Um, I did not address the cross appeal regarding the cup, and I don't want to try the court's patience, but, uh, I did address it in the brief and I'll rely on the brief. Thank you, Your Honors. We'll hear from him. Briefly, Your Honors, I'd like to direct the court's attention really to three cases. One is the Franklin case out of the Supreme Court of Oklahoma. I think that case is important because it addresses this issue of issues of negligence versus issues of immunity. The Hampton case out of the Ninth Circuit, 2023. I think it's important because all